# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2023

Lyle W. Cayce
Clerk

————————

No. 12-70035

————————

Moises Sandoval Mendoza,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:09-CV-86

———————————————————————

Before Richman, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Per Curiam:

Moises Sandoval Mendoza was convicted of capital murder by a Texas jury and sentenced to death. He later filed an application in district court for habeas relief. In an earlier appeal, because his initial counsel had a conflict of interest, we remanded for appointment of additional counsel and further development of potential claims of ineffective trial counsel. An amended application was filed, but the district court rejected all the new claims.

We AFFIRM.

No. 12-70035

## FACTUAL AND PROCEDURAL BACKGROUND

Moises Mendoza was convicted and sentenced to death in 2005. Since his conviction, he has sought relief from the judgment entered against him on direct appeal and in numerous filings for writs of habeas corpus.

Mendoza's victim was Rachelle Tolleson. She lived in Farmersville, a small town in northeast Texas. *See Mendoza v. State*, No. AP-75,213, 2008 WL 4803471, at *1 (Tex. Crim. App. Nov. 5, 2008). On March 17, 2004, after visiting her mother's home, Ms. Tolleson and her five-month-old daughter, Avery, arrived at their house around 10:00 p.m. The next morning, Ms. Tolleson's mother went to the house, as was common practice. The back door was wide open. The bedroom was in chaotic disarray, with the mattress and box springs askew, the headboard broken, other furniture out of place, and papers and other objects scattered around the room. Baby Avery was on the bed alone. *See id.*

Police were summoned, and their investigation identified Mendoza as a prime suspect. Less than a week before the murder, Mendoza had been at the Tolleson home for a party of about fifteen people. Ms. Tolleson and Mendoza spoke a few times, but she told a friend she had no interest in him. Certain other evidence made police suspicious of Mendoza. *See id.* at *1–2.

Mendoza was arrested and confessed to killing Ms. Tolleson. He alleged that she had willingly gone with him in his truck, even though that would mean leaving her six-year-old daughter home alone. He then contended that while in his truck, he choked her, causing her to pass out. He later drove to a field behind his own home, had sexual intercourse with her, and choked her again. Mendoza then dragged her into the field, where he choked her more until she appeared dead. He stabbed her in the throat with a knife to assure her death. After his first interview with police, he moved

her body to a more remote location and burned it. Someone found the body six days later. *See id.* at *2.

It was undisputed at trial that Mendoza had murdered Tolleson. To support capital murder, the indictment charged Mendoza with having committed the murder in the course of a kidnapping and aggravated sexual assault. The jury found he had committed those offenses as well. *Id.* at *3.

For a defendant to be eligible for the death penalty in Texas, the prosecution must prove beyond a reasonable doubt that the murder was "intentionally or knowingly" committed and was aggravated by at least one enumerated circumstance. TEX. PENAL CODE §§ 19.02(b)(1), 19.03. Once a defendant has been found guilty of capital murder, the jury must make findings on two special issues before a sentence of death can be imposed. First, the jury must find beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). This "future dangerousness" issue requires the jury to find the "defendant would constitute a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life." *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010) (quotation marks and citation omitted). Second, the jury must find that there are no "mitigating circumstances . . . to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1). The jury must decide both of these special issues unanimously. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2), (f)(2).

The jury returned a verdict of death. On direct appeal, the Texas Court of Criminal Appeals affirmed Mendoza's conviction and sentence. *Mendoza*, 2008 WL 4803471, at *1. In the state habeas proceeding, the state trial court appointed Lydia Brandt as state habeas counsel. She raised seven

claims.   The state trial court denied relief on all grounds, as did the Court of Criminal Appeals. *Ex parte Mendoza*, No. WR-70,211-01, 2009 WL 1617814, at *1 (Tex. Crim. App. June 10, 2009).

Brandt was appointed to continue her representation as federal habeas counsel. Mendoza's federal habeas application asserted the same seven claims as in state court.   In 2012, the district court entered final judgment denying relief but granted a Certificate of Appealability ("COA") on four ineffective assistance of trial counsel ("IATC") claims.   Those claims were for ineffectiveness due to trial counsel's "failing to obtain a comprehensive psycho-social history, by failing to consider, investigate, and present condition-of-the-mind evidence to negate the *mens rea* element in the guilt-determination phase of his trial, and by failing to adequately investigate and develop crucial mitigating evidence."

Mendoza appealed.   Brandt continued as counsel.   While the appeal was pending, the Supreme Court decided *Trevino v. Thaler*, 569 U.S. 413 (2013).   That case extended the Court's previous holding in *Martinez v. Ryan*, 566 U.S. 1 (2012), to Texas courts. *Trevino*, 569 U.S. at 416–17.   Under these two decisions, a federal court may review an IATC claim that was "defaulted in a Texas postconviction proceeding . . . if state habeas counsel was constitutionally ineffective in failing to raise [the claim], and the claim has 'some merit.'" *Buck v. Davis*, 580 U.S. 100, 126 (2017) (quoting *Martinez*, 566 U.S. at 14); *see also Trevino*, 569 U.S. at 429.

Because Brandt had represented Mendoza as both state and federal habeas counsel, Mendoza moved for the appointment of conflict-free federal habeas counsel.   We remanded to the district court "to appoint supplemental counsel" and "to consider in the first instance whether [Mendoza] can establish cause for the procedural default of any ineffective-assistance-of-trial-counsel claims pursuant to *Martinez* and *Trevino* that he may raise, and if so,

whether those claims merit relief." *Mendoza v. Stephens*, 783 F.3d 203, 203 (5th Cir. 2015).

The district court appointed new habeas counsel. That counsel raised two new IATC claims in November 2016 in a "First Amended Petition for a Writ of Habeas Corpus." Both claims alleged defense counsel's ineffectiveness at the punishment phase. Mendoza's amended application conceded both claims were procedurally defaulted but argued he could overcome the procedural default under *Martinez* and *Trevino* because state habeas counsel's failure to raise the claims in state court amounted to ineffective assistance of counsel.

Mendoza alleged his trial counsel was ineffective for (1) calling Dr. Mark Vigen as a defense expert witness and (2) for failing to investigate and rebut Officer Hinton's testimony by not interviewing Melvin Johnson, an inmate Mendoza had allegedly attacked in prison. Mendoza's new federal habeas counsel interviewed Johnson. Subsequently, Johnson swore in an affidavit that Officer Hinton's testimony was "patently false," that the affiant Johnson was actually the "aggressor," that Mendoza did not fight back, and that Johnson "received an extra tray of food" after the attack that he "figured was a bonus for [his] actions in fighting Mr. Mendoza."

The district court denied relief on both claims. While Mendoza's application for a COA from this court was pending, the Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). There, the Court held that a "federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id.* at 1734. As a result, Mendoza is barred from using the Johnson affidavit to support his failure-to-investigate claim with regards to Officer Hinton's testimony. *See id.* Mendoza asked this court to remand to the district court to consider whether to enter a stay to allow

No. 12-70035

Mendoza to return to state court to present his IATC claim in investigating Officer Hinton's testimony and develop an evidentiary record in support of that claim. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005) (allowing a stay in federal court so additional state proceedings can be conducted).

We summarize. The IATC issues include several that predate our earlier remand to district court. Those are that trial counsel failed to (1) formulate an integrated defense theory throughout all phases of trial, (2) investigate condition-of-the-mind evidence to negate *mens rea*, (3) investigate and develop mitigation evidence, and (4) present crucial mitigating evidence. After the December 2022 district court judgment, we granted Mendoza a COA on two additional claims: trial counsel was ineffective for (5) presenting Dr. Mark Vigen's testimony during the punishment phase of the trial and (6) failing to investigate a jail-yard fight between Mendoza and Johnson.[1] Finally, we also discuss whether (7) Mendoza may return to state court to develop a record regarding the prison fight.

## DISCUSSION

This court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *See Sanchez v. Davis*, 936 F.3d 300, 304 (5th Cir. 2019).

### I

We first consider whether we even have jurisdiction over this appeal. The State argues we do not have jurisdiction over the IATC claims raised by Mendoza's supplemental, conflict-free federal habeas counsel after our 2015 limited remand. *See Mendoza*, 783 F.3d at 203–04. Those are claims (5) and

---

[1] We deferred a decision on the propriety of granting a COA on the claim that Mendoza's state habeas counsel was ineffective for not preserving these issues on appeal.

(6) in our enumeration above. The State contends that those claims are barred by the Antiterrorism and Effective Death Penalty Act's ("AEDPA's") restrictions on second-or-successive habeas applications under 28 U.S.C. § 2244(b). According to the State, our remand did not vacate the district court's final judgment denying habeas relief. Therefore, the State argues, Mendoza is procedurally barred by Section 2244(b) from "amending" his initial application.

Under Section 2244(b), a district court cannot consider a second-or-successive application unless authorization is obtained from the court of appeals.[2] 28 U.S.C. § 2244(b)(3). Mendoza did not obtain such authorization. If the State is right that this is a second-or-successive application, "the District Court never had jurisdiction to consider [these new claims] in the first place." *See Burton v. Stewart*, 549 U.S. 147, 152 (2007).

Mendoza counters that the State's argument conflicts with this court's mandate, to which we are bound by the rule of orderliness. *See Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 n.28 (5th Cir. 2022). Further, Mendoza argues, our mandate ensured there was no longer any "final" judgment under 28 U.S.C. § 1291 because we ordered the appointment of supplemental federal habeas counsel and reopened litigation on the merits for any defaulted IATC claims. He contends that this lack of final judgment

---

[2] A court of appeals may only authorize a second-or-successive habeas application in accordance with statutory restrictions. Specifically, a court of appeals must conclude that the application relies on either: (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (2) newly discovered facts that, if proven, would "establish by clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty." 28 U.S.C. § 2244(b)(2)(A)-(B). If these requirements are not satisfied, we must dismiss the second-or-successive application. § 2244(b)(3)(C).

permitted an amended filing under Section 2242 via Federal Rule of Appellate Procedure 15.

These are unusual circumstances, ones that will not recur. Mendoza's federal habeas litigation began after the Supreme Court's *Martinez* opinion, which seemingly did not apply to federal habeas proceedings by state prisoners in Texas. It was pending on appeal here when *Trevino* was decided. Under those two decisions, a federal court may review an IATC claim that was "defaulted in a Texas postconviction proceeding . . . if state habeas counsel was constitutionally ineffective in failing to raise [the claim], and the claim has 'some merit.'" *Buck*, 137 S. Ct. at 779–80 (quoting *Martinez*, 566 U.S. at 14). Mendoza, however, was represented by the same counsel in both his state habeas proceedings and initial federal habeas proceedings.

An opinion concurring in the limited remand in 2015 acknowledged that Mendoza's counsel's "loyalty to her client reasonably appears to be adversely limited because of her own interests." *Mendoza*, 783 F.3d at 207 (Owen, J. [now Richman, C.J.], concurring). The concurrence identified several other circuit courts that recognized "when state habeas counsel was also trial counsel, an inherent conflict of interest is present." *Id.* (citing *Bloomer v. United States*, 162 F.3d 187, 192 (2d Cir. 1998); *Stephens v. Kemp*, 846 F.2d 642, 651 (11th Cir. 1988); *Riner v. Owens*, 764 F.2d 1253, 1257 (7th Cir. 1985); *Alston v. Garrison*, 720 F.2d 812, 816 (4th Cir. 1983). In a similar vein, having the same state and federal habeas counsel would place Mendoza "in the untenable position of being forced to rely on appointed counsel to identify that counsel's own failings, if any, and to contend in federal court that her failings constituted ineffective assistance of habeas counsel." *Id.* at 208.

We remanded Mendoza's case to the district court to appoint supplemental counsel and for the court to make the initial decision of whether there was "cause for the procedural default of any ineffective-assistance-of-trial-

counsel claims pursuant to *Martinez* and *Trevino* that he may raise, and if so, whether those claims merit relief." *Id.* at 203.

The State argues that Mendoza's case is analogous to several cases outside our circuit, chiefly, *Balbuena v. Sullivan*, 980 F.3d 619 (9th Cir. 2020), which renders his application second-or-successive despite our remand instructions. In *Balbuena*, the Ninth Circuit remanded for an indicative ruling under Federal Rule of Civil Procedure 12.1(b) on the petitioner's Federal Rule of Civil Procedure 60(b) motion regarding a new claim that his confession was improperly obtained. *Id.* at 627, 638. The district court denied the motion but stayed proceedings and allowed him to return to state court to exhaust the new claim. *Id.* at 627–28. The petitioner lost in state court, then returned to district court to file a renewed Rule 60(b) motion. *Id.* at 628. The district court held that adding the new claim was a successive habeas application. *Id.* at 635. The Ninth Circuit agreed, rejecting Balbuena's argument that his habeas application was "pending" for the purposes of Section 2244 because its denial was still on appeal when he filed his Rule 60(b) motion in the district court. *Id.* at 636–37. The court held that once the district court made a final ruling and the appeal had commenced, the Section 2254 application was no longer pending. *Id.*

The *Balbuena* decision is obviously procedurally distinct from the circumstances here. The type of limited remand under Rule 12.1(b) ordered by the *Balbuena* court, one that seeks an indicative ruling, does not disturb finality in the district court. *See id.* at 638; FED. R. APP. P. 12.1. Nor does it allow the district court to consider the merits or a motion under Rule 15. *See Balbuena*, 980 F.3d at 638. Instead, under Rule 12, the district court indicates how it *would* rule on the Rule 60(b) motion (or an equivalent) if its jurisdiction were later restored. FED. R. APP. P. 12.1. advisory committee notes to 2009 amendment. The appellate court "retains jurisdiction" over the entire

No. 12-70035

matter. Fed. R. App. P. 12.1(b); 2 Steven S. Gensler et al., Federal Rule of Civil Procedure, Rule 62.1 (2023).

Here, we did not remand for an indicative ruling. *See Mendoza*, 783 F.3d at 203. Further, we retained only partial jurisdiction (*i.e.*, "jurisdiction in the remainder of the case"), and so, we restored jurisdiction to the district court to hear any new IATC claims if Mendoza could overcome the procedural default of ineffective state habeas counsel. *See id.* We therefore agree with Mendoza that this case is procedurally distinct from *Balbuena* and the other out-of-circuit cases the Government cites.[3]

We also agree with Mendoza that the effect of our mandate was to reopen litigation in the district court. Our remand in this case was not unlimited, though. It was defined in scope to those IATC claims potentially defaulted by a conflicted state habeas counsel now available under *Martinez* and *Trevino*.[4] Even so, once litigation was effectively reopened on the merits for those limited claims, Section 2242 allowed an amended filing: an application "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. §2242. The relevant civil rule on amended and supplemental pleadings is Federal Rule of Civil Procedure 15. Learned authority interprets Rule 15 to mean that "[o]nce [a] case has been

---

[3] The Government cites five courts of appeals cases as support for the argument that "after the district court's judgment is final (in the sense that it is appealable), a filing containing habeas claims is a second-or-successive application, even if the petitioner's appeal is still pending." *See Phillips v. United States*, 668 F.3d 433, 435 (7th Cir. 2012); *Beaty v. Schriro*, 554 F.3d 780, 783 n.1 (9th Cir. 2009); *Ochoa v. Sirmons*, 485 F.3d 538, 540 (10th Cir. 2007); *Williams v. Norris*, 461 F.3d 999, 1003 (8th Cir. 2006); *United States v. Nelson*, 465 F.3d 1145, 1149 (10th Cir. 2006); *United States v. Terrell*, 141 F. App'x 849, 852 (11th Cir. 2005).

[4] We decline to consider the Government's argument raised for the first time on appeal that Mendoza's new claims are barred by AEDPA's statute of limitations. *Wood v. Milyard*, 566 U.S. 463, 474 (2012).

No. 12-70035

remanded, [a] lower court [may] permit new issues to be presented by an amended pleading that is consistent with the judgment of the appellate court." 6 WRIGHT & MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1489 (3d ed. 2022). Indeed, in its response before the district court, the Government answered on the merits and did not challenge jurisdiction. Further, the district court entered a new final judgment when it completed its remand duties.

Both parties urge us to resolve the broader question of whether a habeas filing is second-or-successive when proceedings on the initial application are ongoing. The Government urges us to follow several circuits' lead in holding that, after a district court's judgment is final, a filing containing a habeas claim is a successive application, even if the petitioner's appeal is still pending. *See Phillips*, 668 F.3d at 435; *Beaty*, 554 F.3d at 783 n.1; *Ochoa*, 485 F.3d at 540; *Williams*, 461 F.3d at 1003; *Nelson*, 465 F.3d at 1149; *Terrell*, 141 F. App'x at 852. Mendoza urges us to adopt the opposite approach, and argues that holding otherwise conflicts with Supreme Court precedent in *Slack v. McDaniel*, 529 U.S. 473, 487–88 (2000), *Banister v. Davis*, 140 S. Ct. 1698 (2020), and *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). Mendoza would have us follow the approaches in *United States v. Santarelli*, 929 F.3d 95, 105–06 (3d Cir. 2019) and *Whab v. United States*, 408 F.3d 116, 118–19 (2d Cir. 2005), which hold that a subsequent habeas application is not successive if an appeal is ongoing.

We decline to resolve that broader question here because of the unusual timing of Mendoza's case does not require such a decision. Instead, we confine our holding to the narrow facts of this case.

II

We now turn to the merits of Mendoza's appeal. "In a habeas corpus appeal, we review the district court's findings of fact for clear error and its

11

conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Escamilla v. Stephens*, 749 F.3d 380, 387 (5th Cir. 2014).

Mendoza first argues that the district court erred in denying his motion for an evidentiary hearing. If a petitioner failed to develop the factual basis of a claim in state court, he may obtain an evidentiary hearing on the claim in federal court if he shows that: (1) either "the claim relies on . . . a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicate that could not have been previously discovered through the exercise of due diligence;" and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). In cases where Section 2254(e)(2) does not bar the district court from holding an evidentiary hearing, this court reviews the denial of the evidentiary hearing for abuse of discretion. *Blue v. Thaler*, 665 F.3d 647, 655 (5th Cir. 2011).

Mendoza argues that the district court abused its discretion because the new evidence in the defense team members' responses to the interrogatories created a genuine issue of material fact as to whether Mendoza's defense team conducted an adequate mitigation investigation. He asserts that, because he made the "required *prima facie* showing of a material issue of fact, the [district] court was required to conduct an evidentiary hearing."

"[A] district court's refusal to hold an evidentiary hearing in a § 2254 proceeding is an abuse of discretion only if the petitioner can show that (1) the state did not provide him with a full and fair hearing, and (2) the allegations of his petition, if proven true, . . . would entitle him to relief." *Id.*

(alteration in original) (quotation marks omitted). In addition, a third condition is that federal courts are prohibited "from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)." *Id.* at 656 (citing *Cullen v. Pinholster*, 563 U.S. 170 (2011)). Because a federal habeas court cannot "consid[er] new evidence when reviewing claims that have been adjudicated on the merits in state court," if Mendoza's claim was adjudicated on the merits in state court, it could not have been error for the court to deny an evidentiary hearing. *See Broadnax v. Lumpkin*, 987 F.3d 400, 407 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

Mendoza asserts that, because he sought discovery in state court, but it was denied, the Texas Court of Criminal Appeals failed to provide him with due process and his claims were not adjudicated on the merits. Mendoza relies substantially on Fourth Circuit decisions holding that "when a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures," and, therefore, "[i]f the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." *Winston v. Kelly* (*Winston I*), 592 F.3d 535, 555–56 (4th Cir. 2010); *Winston v. Pearson* (*Winston II*), 683 F.3d 489, 501–02 (4th Cir. 2012).

With respect for that circuit, we have consistently held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Boyer v. Vannoy*, 863 F.3d 428, 446 (5th Cir. 2017) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001)). Such a requirement is supported neither by the plain text of Section 2254(d), which makes no reference to a full and fair hearing, nor by the legislative landscape

against which AEDPA was passed, which involved excising from the pre-AEPDA version of Section 2254 references to a full and fair hearing. *Valdez*, 274 F.3d at 949–51. Further, "[w]here we have conducted an examination of whether an 'adjudication on the merits' occurred, we have looked at whether the state court reached the merits of the petitioner's claim rather than deciding it on procedural grounds." *Id.* at 952.

As in *Valdez*, evidence relevant to Mendoza's claims was not included in the record — due to the Court of Criminal Appeals' denial of Mendoza's motion for discovery — and was not reviewed by the court in making its decision. Likewise, the Court of Criminal Appeals' denial of Mendoza's claims was based not upon procedural grounds but upon the merits of the claims, albeit without the benefit of additional material evidence. *Ex parte Mendoza*, 2009 WL 1617814, at *1. We conclude that, as we held in *Boyer* and *Valdez*, Mendoza's claims were adjudicated on the merits. In one precedent, we held that "where a petitioner's habeas counsel had raised an issue in the state habeas court, albeit ineffectively from a constitutional standpoint, the petitioner was barred by *Pinholster* from offering new evidence in federal court precisely because the original claim had been 'fully adjudicated on the merits' in state court." *Broadnax*, 987 F.3d at 409 (quoting *Escamilla*, 749 F.3d at 394–95).

Because Mendoza's claims were adjudicated on the merits in state court, an evidentiary hearing could not have aided the district court in its review. Therefore, the district court did not abuse its discretion in denying Mendoza's motion for an evidentiary hearing.

Mendoza also (1) challenges the application of AEDPA deference under Section 2254(d) to the Court of Criminal Appeals' decision and (2) requests this court consider the interrogatories the federal district court ordered and considered. He premises both this challenge and request on the

No. 12-70035

ground that, due to the Court of Criminal Appeals' denial of his motion for discovery, its decision was not an adjudication on the merits. For the reasons already explained, we reject these arguments.

Section 2254(d)'s highly deferential standard applies. We now discuss the relevant claims with that deference.

## III

We begin with the four claims for which a COA was granted in 2013. All four of these claims concern the ineffective assistance of trial counsel. In order to prevail on an IATC claim, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). "'Surmounting *Strickland*'s high bar is never an easy task' . . . [and] [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id*. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Because *Strickland* and Section 2254(d) are highly deferential, our review is doubly deferential when both apply in tandem. *Id*.

"When § 2254(d) applies, the question is not whether counsel's actions were reasonable. . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The 2013 COA was granted on four IATC claims: trial counsel failed to (1) formulate an integrated defense theory throughout all phases of trial, (2) investigate condition-of-the-mind evidence to negate *mens rea*, (3) investigate and develop mitigation evidence, and (4) present crucial

mitigating evidence. All four of Mendoza's claims stem from the premise that his defense team unreasonably failed to conduct an adequate investigation of Mendoza's psycho-social history. Had counsel conducted an adequate investigation, he asserts, they would have discovered evidence of adverse childhood experiences and attachment disorder, leading to binge drinking that culminated in brain damage. With this information, Mendoza argues his defense team could have — and should have — argued that (1) Mendoza's brain damage prevented him from forming the necessary *mens rea* of intent to kill; and (2) that on the night of the murder, his attachment disorder, amplified by the negative relationship with his former girlfriend, resulted in a catathymic homicide. A catathymic homicide, rather than intentional murder, is an unintentional "culmination" of the attachment disorder.

Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. If counsel opts not to explore a particular line of defense, that decision must be assessed for reasonableness in light of all the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691. The Court of Criminal Appeals concluded that the investigation conducted by Mendoza's defense team was constitutionally adequate. It found that the defense team had conducted a "comprehensive and thorough investigation into [Mendoza's] psycho-social history" and determined that counsel had acted reasonably in not further investigating, developing, and presenting the theories of attachment disorder, alcohol-related brain damage, and catathymic homicide advocated by Mendoza on habeas. The court based its conclusion in part on the fact that Mendoza failed to identify on habeas "any specific, credible fact or event . . . that [his defense team] failed to uncover."

No. 12-70035

The record supports that the Court of Criminal Appeals' decision was not an unreasonable application of *Strickland*. Further, the cases Mendoza cites are distinguishable. In one precedent, the state habeas mitigation investigation revealed a "tidal wave of information," including "a childhood marked by extreme neglect and privation [and] a family environment filled with violence and abuse." *Andrus v. Texas*, 140 S. Ct. 1875, 1879 (2020). Here, the traditional factors for mitigating evidence and ineffective counsel were arguably absent, and there is no evidence of a substantial quantity of missed information that would have swayed the jury's mind. *Id.* at 1880.

The Supreme Court has found investigations to be constitutionally inadequate when counsel did not begin their investigation until a week before trial, did not seek relevant records, and did not return a willing witness's phone call. *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000). Inadequacy also was shown when the investigation was limited to reviewing the defendant's presentence investigation report and various social services records and counsel "acquired only rudimentary knowledge of [petitioner's] history." *Wiggins v. Smith*, 539 U.S. 510, 523–24 (2003). Another example was when counsel spent only one day or less investigating and spoke only with witnesses selected by the defendant's mother. *Sears v. Upton*, 561 U.S. 945, 952 (2010). Our final comparator is when counsel "did not obtain any of [the defendant's] school, medical, or military service records or interview any members of [his] family." *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

In contrast, Mendoza's defense team obtained Mendoza's school and medical records, as well as his father's medical records. It spent a considerable number of hours over the course of a month interviewing Mendoza, his parents, his siblings, and individuals from his high school and church. From these records and interviews, Mendoza's defense team learned that his father had a history of depression; his cousin had attempted to sodomize Mendoza when he was a child; his uncle had suffered from

17

bipolar disorder and had been killed by Mendoza's cousins after the uncle tried to kill them; Mendoza had spent time with those same cousins; and that Mendoza had issues with alcohol and drug use that his family members thought might have altered his mind.  Given the extent of the investigation conducted by Mendoza's defense team, the Court of Criminal Appeals' conclusion that the investigation was not constitutionally deficient was reasonable.

Even if the investigation conducted by Mendoza's defense team was constitutionally inadequate, Mendoza must still establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.  We examine prejudice, though we find the investigation to have been adequate.

Mendoza first argues that he was prejudiced by counsel's failure to conduct a thorough investigation because counsel was unable to formulate an integrated defense theory, and instead presented differing theories of defense during the voir dire, guilt/innocence, and sentencing phases of the trial.  He asserts that had counsel presented a unified theory, the defense could have rebutted the prosecution's arguments that Mendoza chose to commit violence against women despite his positive upbringing and that his crime was the result of his evil choices.

The Government argues that the unified theory of defense proffered by Mendoza on habeas has its own problems.  First, Mendoza's unified theory posits that Mendoza suffers from attachment disorder, which caused involuntary abuse of alcohol, which later caused brain damage.  Then, on the

night of the offense, his attachment disorder, amplified by his negative relationship with his former girlfriend, resulted in an unintentional catathymic homicide. This is a complicated theory to use with a jury. Second, the jury may well have rejected that Mendoza's alcohol abuse was involuntary, especially because jurors had stated during *voir dire* that mitigation arguments premised on voluntary intoxication would not be persuasive. Third, the catathymic homicide theory is inconsistent with the literature observing that perpetrators of catathymic homicides generally have no prior history of violence. Additionally, this theory might have opened the door to otherwise inadmissible evidence regarding Mendoza's numerous violent acts. Finally, due to the complex and technical nature of Mendoza's proffered theory, the defense would have likely needed to provide additional experts even though the jury had given negative responses to defense experts on juror questionnaires. In light of these concerns, it is not reasonably probable that the outcome of the proceedings would have been different had defense counsel presented this unified defense theory.

Mendoza next argues that he was prejudiced by the inadequate investigation because counsel was unable to present condition-of-the-mind evidence to negate *mens rea* during the guilt/innocence phase of the trial. He asserts that had counsel conducted a thorough investigation, the defense would have been able to present evidence of Mendoza's attachment disorder and brain damage that would have negated the *mens rea* for knowing and intentional murder.

This argument suffers from many of the same defects as Mendoza's claim of prejudice from not having a unified defense theory: the complexity of the argument, the jury's negative response to intoxication as a mitigating factor, and the requirement of additional experts. Especially problematic is Mendoza's inability to assert with any certainty that he actually had extensive brain damage that would have precluded him from formulating the requisite

*mens rea*. The expert he relied on in state habeas proceedings affirmed that Mendoza's defense team "*could* have conclusively proved the existence of neuropsychological damage," and that neuropsychological tests "would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to it adversely affected his higher cognitive functioning and reasoning skills." (emphasis added).  Because "impaired cognitive abilities due to alcohol abuse tend to recover with abstinence," however, the extent of Mendoza's brain damage at the time of the murder is largely speculative. Indeed, the Court of Criminal Appeals found that Mendoza had "not presented persuasive evidence that he has or has ever had a cognitive impairment."

Finally, Mendoza argues that the defense team's inadequate investigation prevented counsel from presenting evidence regarding his family's behavior of criminality and domestic violence and the toxic impact of his former girlfriend and her family.  He contends that the failure to develop and present this evidence prejudiced him because the defense was unable to rebut the prosecution's story that Mendoza had come from a good environment but simply made evil choices.  With respect to sentencing, the evidence that Mendoza was molded to model criminal behavior is double-edged: while it "might permit an inference that he is not as morally culpable for his behavior, it also might suggest [that the defendant], as a product of his environment, is likely to continue to be dangerous in the future."  *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *see also Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002).  Additionally, the prosecution presented extensive evidence at sentencing that Mendoza had a history of violence, especially towards women.  "[T]he evidence of [the defendant's] future dangerousness was overwhelming.  When that is the case, it is virtually impossible to establish prejudice."  *Ladd*, 311 F.3d at 360.  There is not a

reasonable probability that the jury would have concluded that the balance of aggravating and mitigating factors did not warrant death.

## IV

Having dispensed with the four claims for which a COA was granted in 2013, we turn to the three claims for which a COA was granted in 2020.

The first of those claims is that the actions of Mendoza's trial counsel constituted ineffective assistance for the presentation of Dr. Mark Vigen's testimony during the punishment phase of the trial. The same standards for ineffective assistance of counsel discussed above apply, but this claim is procedurally defaulted because Mendoza did not raise it in his state habeas proceedings. Because of the default, we first address whether Mendoza's trial counsel was ineffective and then whether his procedural default of that claim was excused by the ineffectiveness of his state habeas counsel under *Martinez* and *Trevino*.

Mendoza argues that his trial counsel was ineffective by calling Dr. Vigen, an expert psychologist, to testify that (1) Mendoza had no moral compass or sense of self, (2) there was an absence of traditional mitigation factors, and (3) Mendoza was dangerous. These claims present a close question but are ultimately unmeritorious, particularly when this testimony is read in its proper context and coupled with Dr. Vigen's experience in other capital cases and his purported ability to "create great rapport with juries."

Mendoza first objects to Dr. Vigen's testimony that Mendoza had no moral compass or sense of self. Dr. Vigen concluded that Mendoza "is an immature, psychologically under-developed adolescent-like man who has no internal sense of himself . . . no inner self, no clear inner identity." Mendoza argues that this testimony would have made more sense coming from the prosecution because "the death penalty calls for a 'moral assessment,' . . . and a person without a 'compass' or 'identity' arguably is a

person whose life is not worth sparing." The testimony was not so unreasonable, as Dr. Vigen also testified that Mendoza was still an adolescent and that his brain would not be fully developed until his mid-twenties, helping to explain his psychological condition. Further, Dr. Vigen opined that Mendoza "has the potential to develop a sense of self and the potential for rehabilitation and some type of spiritual conversion." He described Mendoza's dawning recognition of his own "depression" and "emptiness," and his own potential to gain further self-awareness, better appreciate the "tremendous seriousness" of his actions, and cultivate remorse. Viewed as a whole, it was not deficient of trial counsel to believe this testimony would help Mendoza.

Mendoza next objects to Dr. Vigen's testimony that the traditional mitigation factors did not apply to Mendoza. Dr. Vigen testified that "in most of the cases that I've seen there are incidents — there's the criminal history in the family or there's an alcohol and drug instance in the family or there's a mental health issue in the family," but that "[t]here's something missing in this case for me as a psychologist . . . those general factors . . . are just not present." However, in context, Dr. Vigen was trying to redirect focus to the factors that were present. The quote above continues: "and the family is really on one level trying to work very hard and do their very, very best. On the other level, there is some dysfunction in terms of attachment. [Mendoza] didn't attach to his dad. He worked with him all the time, but he could never talk to him. They could never connect." Dr. Vigen went on to explain that Mendoza's father "has a major affective disorder," which "may, in some way, predispose [Mendoza] to alcohol dependency." Additionally, earlier in this testimony, Dr. Vigen laid out the mitigation factors. On direct examination, he testified that Mendoza "[came] from a psychologically dysfunctional family" with a father "who was a fragile man, who really didn't have the power to be a dad" and a "mom [who] was sort of covering in some

ways . . . continually rescu[ing]" Mendoza so that "he really didn't experience the consequences of some of his negative behavior."

Along these same lines, Mendoza argues that "far from attempting to lessen Mendoza's culpability, [Dr.] Vigen testified that Mendoza had made a *choice*: Mendoza 'could have chosen' to live a 'responsible' life, but '[s]ometimes' kids 'don't [listen].'" Dr. Vigen did testify that Mendoza's brother Mario would have been a "good role model" but that "[t]he problem is [Mario] really feels that he left too early and that he wishes he had been more of a role model." When Dr. Vigen said that sometimes kids do not listen, he was talking about his second opinion, "that [Mendoza] comes from a psychologically dysfunctional family" and explaining that he was "not trying to be critical of the family. It's a good family. But no family is perfect, and families offer their children a smorgasbord of their good behaviors and their not-so-good behaviors. Parents don't control what children come and take from them . . . Sometimes the kids listen. Sometimes they don't. Sometimes they should listen. Sometimes they shouldn't."

Although certain aspects of the testimony were not ideal, which is hardly unusual or constitutionally deficient in general, we are not convinced the choice to present this testimony as a whole falls outside the "'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

The third portion of testimony Mendoza objects to is Dr. Vigen's testimony on future dangerousness. The first piece of future dangerousness testimony Mendoza objects to is when Dr. Vigen admitted on cross examination: State: "The Defendant has already proven to us, hasn't he, that in a free society he is a very dangerous individual, isn't he? [Dr. Vigen]: I think that's — the jury has decided that, and I certainly agree with that." But this was at the sentencing phase of trial; at this point, everyone knew the

reality that Mendoza would spend the rest of his life in prison, never in free society.  Dr. Vigen emphasized several times that his assessment was accounting for the fact that the jury had already convicted Mendoza of capital murder.  Mendoza argues that the "prosecution understood the import of this testimony and the gravity of the error, arguing in closing that Mendoza's 'very own witness, Dr. Vigen . . . told you that [he] is dangerous in society . . . . So you know the answer to [the future dangerousness] question.'"  The context of the use of Dr. Vigen's testimony in closing shows that the prosecution was referring to all the other factors as well:

> But it's not just the prison system.  Because that question asked you whether he is a danger to society, anyone inside or outside that he may encounter.  The question is if he is given the opportunity, the opportunity to do violence, will he do it?  And you know that he will.

> His very own witness, Dr. Vigen.  Dr. Vigen told you that this Defendant is dangerous in society.  And the Defendant's own words while he sat in our jail, he wrote that he will fight his conscience until he is forever unconscious.  So you know the answer to that question.

> You know, the best predictor of future behavior is past behavior.  And you know already about the escalation of violence in his life to this point that has already culminated in the ultimate sadistic act.

The prosecution then segued into the many other incidents in Mendoza's life that signified future violence.

Mendoza also objects to another aspect of this future dangerousness testimony: Dr. Vigen claimed that Mendoza's "bad behavior persists now even in the jail," and despite being imprisoned, Mendoza continues to "cause[] trouble."  However, throughout his testimony, Dr. Vigen minimized the severity of Mendoza's actions in jail, describing them as a

"nuisance," and his behavior evidencing immaturity, and stating, "You know, it's just adolescent behavior . . . [a]ttention-seeking behavior." Dr. Vigen also opined that the Texas Department of Criminal Justice could house Mendoza such that he would present a "low or minimum risk for future violence," and that a life sentence of imprisonment would encourage rehabilitation.

Mendoza argues that this theory that he could be rehabilitated in prison once he was separated from his "depraved friends" "invited the prosecution to present Mendoza's jail record, including [Officer] Hinton's (uninvestigated) account of Mendoza's alleged attack on Johnson." (citing *Arizona v. Fulminante*, 499 U.S. 279, 300 (1991); *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002)). Other evidence, however, independently invited rebuttal testimony regarding Mendoza's behavior in prison. For instance, the priest's testimony regarding Mendoza's improved "demeanor and attitude" during their visits in prison permitted the rebuttal evidence, as did Mendoza's brother's testimony that, apart from "a couple of incidents where the guards antagonized him," Mendoza had been a "model citizen" in prison.

Further, the precedent Mendoza uses to support his objection to the future dangerousness testimony is unpersuasive. Mendoza analogizes to a Supreme Court decision holding that counsel's presentation of expert testimony regarding future dangerousness was objectively unreasonable. *Buck*, 580 U.S. at 118-121. The testimony in that case, though, is quite distinguishable. In *Buck*, counsel "specifically elicited testimony about the connection between [the defendant's] race and the likelihood of future violence" and offered an expert report "reflect[ing] the view that [the defendant's] race disproportionately predisposed him to violent conduct." *Id.* at 119. The Court stated that, had the testimony been presented by the

state, these racialized arguments would be "patently unconstitutional." *Id.* This far exceeds any deficiency shown in presenting the testimony here.

Additionally, as to all three categories of Dr. Vigen's testimony to which Mendoza objects, trial counsel's choice to present was supported by a strategic justification. When evaluating an ineffective assistance of counsel claim, "[t]his court will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007); *see also Strickland*, 466 U.S. at 691. "Moreover, we have consistently found counsel's decisions regarding examination and presentation of witnesses and testimony to fall within this category of trial strategy which enjoys a strong presumption of effectiveness." *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011). Mendoza's trial counsel explained in affidavits that the presentation was strategic: Dr. Vigen could "explain the bad with the good," and Dr. Vigen could support counsel's theory that, although Mendoza had fallen in with a bad crowd and engaged in "depraved behavior, . . . this could be controlled in prison and eventually lead to some redemption." Trial counsel wanted to offer "an explanation for [Mendoza's] conduct, not an excuse," which reflected counsels' view that "it was better that [the jury] hear [any damaging information] explained by [the defense's] expert than by the state's witnesses."

The closest opinion on point Mendoza offers is *Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987). There, the defense presented an expert witness who "testified on cross-examination that Magill was not under the influence of an extreme emotional or mental disturbance at the time of the crime," instead of offering a second expert who "could have testified that Magill exhibited signs of serious emotional problems at the age of thirteen" and who "'definitely would have projected' the appellant could be involved in a crime of this magnitude" based on that finding. *Id.* at 889. Further, in that case, the Eleventh Circuit stated that it could not "accept the district court's view

that [counsel] made an informed, strategic choice not to call" the second expert, because counsel at a hearing stated that he would have called the second expert if he had been available but could not recall any efforts to contact that expert and there was no evidence that expert was unavailable. *Id.* Here, as discussed above, trial counsel explained the strategic justification and there was no uncalled witness as in *Magill*.

This principle that ineffective counsel decisions that amount to deficiency are those made without strategic justification is supported by other circuit court opinions on which Mendoza relies. We held in one of the cited opinions that trial counsel's performance was deficient when counsel questioned the defendant about his silence following arrest, allowing the state to probe this evidence on cross-examination. *White v. Thaler*, 610 F.3d 890, 902 (5th Cir. 2010). In *White*, though, an affidavit from defense counsel made clear that the questioning "was not part of a strategy." *Id.* at 900. Here, by contrast, Dr. Vigen's testimony served defense counsel's strategy to explain that a life prison sentence would control and shape Mendoza's behavior for the better. Further, unlike the defendant's post-arrest silence in *White*, Mendoza's prison conduct was not "otherwise inadmissible evidence," *White*, 610 F.3d at 899, because the State could have presented evidence of that conduct in its case in chief, *see Williams v. Lynaugh*, 814 F.2d 205, 207–08 (5th Cir. 1987), and other defense testimony independently invited the State's rebuttal. Likewise, Mendoza cites *Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008) and *Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009). Both of those cases turned on a failure to investigate or present mitigating or exculpatory evidence that existed, not counsel's decision to present a certain expert. *See Johnson*, 544 F.3d at 605; *Richards*, 566 F.3d at 566–67. Mendoza has not argued that there was a similar traumatic event in his lifetime that Dr. Vigen could have pointed to as a mitigating factor.

Mendoza also specifically objects to one portion of the strategy regarding the future dangerousness special issue, arguing that defense counsel's choice to focus on Mendoza's conduct inside prison rather than outside "was not only legally mistaken but also unreasonable on this record." It is plausible, though, that counsel's strategy stemmed not from a misunderstanding of the legal standard, but rather from the reality of Mendoza's potential sentence. In closing, counsel told the jury, "when you answer the Special Issues, especially Special Issue Number 1 [the future dangerousness question], you have to remind yourself that you're dealing with that question in the context of prison, because [Mendoza has] already been convicted of capital murder and that's where he's going."

To show error in this context, Mendoza cites an opinion for the proposition that, even when a prisoner would never be eligible for parole, the question is still "whether there is a probability that the defendant would constitute a continuing threat to society whether in or out of prison." *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010) (quotation marks omitted). There was no need, the court stated, for the state to prove "beyond a reasonable doubt that the defendant would get out of prison through means of escape or otherwise." *Id.* Importantly, *Estrada* further held that the evidence of the defendant's brutality and lack of remorse supported the jury's future dangerousness finding:

> In this case, we decide that the evidence of appellant's unremorseful, premeditated, brutal murders of Sanchez and their unborn child by stabbing Sanchez thirteen times, of his pattern of using his position of trust as a youth pastor to take sexual advantage of underage girls in his youth group, of his threat to "ruin" another former member of the youth group when she threatened to expose appellant, and of the opportunities for a life-sentenced-without-parole appellant to

commit violence in prison are sufficient to support the jury's affirmative answer to the future[]dangerousness special issue.

*Id.* at 284–85.

That is the same sort of testimony that was presented by the prosecution here, which is why Mendoza cannot show that any potential error in presenting Dr. Vigen's testimony prejudiced him.

In order to succeed on his *Strickland* claim, Mendoza would also need to show that any potential ineffective assistance prejudiced him. *See Strickland*, 466 U.S. at 677. Establishing prejudice requires showing "that there is a reasonable probability" (or, a "probability sufficient to undermine confidence in the outcome") "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 668, 694. "The likelihood of a different result must be substantial, not just conceivable." *Trevino v. Davis*, 829 F.3d 328, 351 (5th Cir. 20016) (quoting *Brown v. Thaler*, 684 F.3d 482, 491 (5th Cir. 2012)).

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Because Mendoza's "death sentence required a unanimous jury recommendation, TEX. CODE CRIM. PROC. ANN., art. 37.071, prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [his] 'moral culpability.'" *See Andrus*, 140 S. Ct. at 1886 (quoting *Wiggins*, 539 U.S. at 537–38). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. "Moreover, a verdict or conclusion only weakly

supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

Mendoza also argues that prejudice is shown because the prosecutor referred to Dr. Vigen's testimony in closing argument, and during deliberations, the jury asked about Mendoza's record while in jail. However, the jury heard an overwhelming amount of independent aggravating evidence, including that Mendoza: raped a fourteen-year-old girl twice, and during one of the rapes performed similar acts on her with a beer bottle and pen — which he videotaped and then showed to others while laughing; attempted to strangle a girl at a party and the "only thing that got him off of [her] was two people getting him off of [her]," put a pill into a girl's drink, and, when confronted by the host, "slammed [him] up against [his] friend's truck and stuck [a] knife to [his] stomach," committed multiple robberies, attacked his younger sister, and told two girls on the night of the murder that he would cut their throats with a rusty saw. The prosecution also covered these events in closing.

This substantial aggravating evidence is in addition to the facts of this murder, which Texas law recognizes "alone may be sufficient to sustain the jury's finding of future dangerousness." *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010). The jury also heard evidence from other witnesses about the lack of mitigating circumstances, such as that Mendoza graduated high school and grew up in a supportive religious home with both parents and brothers as his role models. "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." *Strickland*, 466 U.S. at 700.

Because Mendoza's trial counsel was not ineffective, this court need not and does not consider whether the claims can survive procedural default. *See Nelson v. Davis*, 952 F.3d 651, 673 (5th Cir. 2020). "As with any other IATC claim, the underlying IATC-Participation claim (which, *if viable*, may allow a claim that state habeas counsel potential ineffectiveness prejudiced Nelson, thereby excusing procedural default) requires a showing of two elements." *Id.* (emphasis added).

V

The final issue is whether to remand to the district court to stay, or consider staying, federal habeas proceedings under *Rhines*, 544 U.S. at 275.

Mendoza argues that he "has never had a full and fair opportunity to litigate the merits of his claim that trial counsel were ineffective for not investigating [Officer] Hinton's allegedly false testimony." Because this claim was never presented in state court, Mendoza cannot rely on the Johnson affidavit to support his claim in federal court under the Supreme Court's precedent in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). He asks this court in a motion to remand for entry, or at least consideration, of a *Rhines* stay so that he can litigate this claim in state court.

District courts may stay federal habeas proceedings to allow a petitioner to exhaust a claim in state court to ensure that petitioners with mixed claims do not "forever los[e] [the] opportunity for any federal review of their unexhausted claims." *Rhines*, 544 U.S. at 275. A stay is available where a petitioner can show: (1) good cause for the failure to exhaust, (2) that the request is not plainly meritless, and (3) that the request is not for purposes of delay. *Id.* at 277–78.

The Government primarily argues that, because Mendoza's claim is procedurally barred from being presented in Texas state court, his claim is "plainly meritless" under *Rhines*. *Neville v. Dretke*, 423 F.3d 474, 480 (5th

Cir. 2005). Under Texas law, second-or-successive habeas applications must be denied unless a habeas petitioner can show that (1) "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;" and, (2) "but for" the constitutional violation, either "no rational juror could have found the applicant guilty beyond a reasonable doubt" or "no rational juror would have answered in the state's favor one or more of the special issues" necessary for the sentence of death. TEX. CODE CRIM. PROC. art. 11.071, § 5(a).

Mendoza argues that his application would not be denied because Texas courts have previously allowed successive applications where a petitioner claims the State relied on false testimony or withheld evidence. Further, he contends that federalism dictates that Texas should be afforded the opportunity to "decide whether [*Ramirez*] impacts its application of the abuse-of-the-writ doctrine" because petitioners are now barred from receiving federal review of their claims if the evidence is not already in the state court record. The Government counters that the district court has already found that Mendoza failed to prove Officer Hinton's testimony was false, so he has not lost an opportunity to litigate that claim anyway.

Mendoza's request for a *Rhines* stay is meritless in this context. Texas law forecloses the argument that state habeas counsel's ineffectiveness renders the factual basis unavailable at the time of the initial writ. *See Ex parte Graves*, 70 S.W.3d 103, 117 (Tex. Crim. App. 2002). Mendoza concedes this point, but argues that *Graves* should be "reconsider[ed]" in light of *Ramirez* and its subsequent-writ-bar under principles of comity. The opportunity to reconsider state court precedent, however, is not in itself enough to grant a *Rhines* stay. Moreover, the district court already analyzed the affidavit evidence and held that there was no "reasonable likelihood that Officer Hinton's testimony could have affected the judgment of the jury."

No. 12-70035

## VI

As to the four claims for which the district court granted a COA, Mendoza has not shown that trial counsel's actions in investigating, compiling, and presenting *mens rea* and mitigating evidence fell below an objective standard of reasonableness. As to the remaining claims for which we granted a COA, Mendoza has not shown that trial counsel was ineffective for presenting Dr. Vigen's testimony and Mendoza's request for a *Rhines* stay is plainly meritless in this context.

We AFFIRM the district court's judgment and DENY Mendoza's motion for a *Rhines* stay.